**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**
**(Case No. 16-1074)**

𝕴𝖓 𝕿𝖍𝖊

# 𝕴𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

### 𝕱𝖔𝖗 𝖙𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## DURHAM SCHOOL SERVICES, LP,

*Petitioner,*

v.

## NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

### ON PETITION FOR REVIEW FROM
### THE NATIONAL LABOR RELATIONS BOARD

──────────

### BRIEF OF PETITIONER

──────────

**Amanda A. Sonneborn**
**Seyfarth Shaw LLP**
**131 South Dearborn Street, Suite 2400**
**Chicago, Illinois 60603**
**(336) 721-1001**

*Counsel for Petitioner*

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA
Case No. 16-1074

DURHAM SCHOOL SERVICES, L.P.,   )
)
             Petitioner,   )
)
     v.   )
)
NATIONAL LABOR RELATIONS   )
BOARD,   )
)
         Respondent.   )
)

## PROVISIONAL CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1) of this Court's rules, counsel for *Durham School Services, L.P.* certifies the following:

### A.  Parties And Amici

1.  *Durham School Services, L.P.* was the Respondent in the underlying proceeding before the NLRB. It is the Petitioner before this Court.

2.  Teamsters Local Union No. 853, International Brotherhood of Teamsters, Change to Win, ("Union") was the Charging Party in the underlying proceeding before the NLRB. The Union has not at this time made any motion to intervene in this proceeding.

3.  National Labor Relations Board ("Board") is the Respondent before this Court.

    4.     There are no amici in this matter.

**B.**    **Rulings Under Review**

Decision and Order of National Labor Relations Board in *Durham School Services, L.P.*, 363 NLRB No. 129 (February 19, 2016).

**C.**    **Related Cases**

There are no prior cases involving the orders under review in this case and there are no pending related cases.

**D.**    **Corporate Disclosure Statement**

Pursuant to Fed. R. App. 26.1 and D.C. Circuit Rule 26.1, Durham School Services, L.P., certifies that it is a wholly-owned indirect subsidiary of National Express LLC, a domestic corporation, and that National Express LLC is a wholly-owned indirect subsidiary of National Express Group plc, a foreign corporation headquartered in the United Kingdom and publicly traded on the London Stock Exchange.

So certified, this 30th day of September, 2016.

/s/ *Amanda A. Sonneborn*

Amanda A. Sonneborn
Seyfarth Shaw LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
Telephone: (312) 460-5000
Facsimile: (312) 460-7000
cbusey@seyfarth.com

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF ISSUES ................................................................................3

PERTINENT STATUTES ................................................................................4

STATEMENT OF the CASE.............................................................................4

    Procedural History ................................................................................4

    Durham's Hayward Operation..............................................................6

    Lead Dispatcher Michelle Dorton ........................................................6

    Dorton's Role as Lead Dispatcher........................................................7

    Dorton's Union Activities ...................................................................11

    Objections ..........................................................................................13

        A.    Objection 1 ......................................................................13

        B.    Objection 2 ......................................................................13

        C.    Objection 3 ......................................................................13

        D.    Objection 4 ......................................................................14

SUMMARY OF ARGUMENT ........................................................................14

STATEMENT OF STANDING ........................................................................15

ARGUMENT ................................................................................................16

    Standard Of Review............................................................................16

Discussion Of Issues.................................................................17

A.  Because Dorton Is A Section 2(11) Supervisor, Her Pro-
    Union Conduct Leading Up To The Election Is Analyzed
    With Heightened Scrutiny...............................................17

    1.  Dorton Possesses General Discretionary Authority
        of a Supervisor. ......................................................18

    2.  Dorton's Authority Over Moncado and Garcia
        Cements Her Supervisory Status. ............................21

B.  Dorton's Pro-Union Conduct Reasonably Coerced The
    Free Choice Of Employees. ............................................23

    1.  Dorton's Conduct Interfered With Employees'
        Exercise of Free Choice............................................25

    2.  Dorton's Interference With Freedom of Choice
        Materially Affected the Outcome of the Election....................28

C.  Appeals to Racial-Bias Affected the Outcome of the
    Election...........................................................................31

    1.  The Conduct of Union Business Agents Improperly
        Affected the Outcome of the Election. ....................31

    2.  The Conduct of a Third-Party Improperly Affected
        the Outcome of the Election. ..................................34

D.  The Imposition of the New NLRB Rules and Regulations
    Violate Durham's Rights and Prejudiced Durham ...........................36

CONCLUSION ....................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Long, Inc.*, 173 NLRB 447 (1969) ......................................................36

*Alternate Concepts, Inc.*, 358 NLRB 292 (2012) ...................................18

*Avante at Boca Raton, Inc.*, 323 NLRB 555 (1997)...............................28

*Avis-Rent-A-Car System*, 280 NLRB 580 (1986) ...................................33

*Buchanan Marine, L.P.*, 363 NLRB No. 58 (Dec. 2, 2015)............................18, 19

*Cambridge Tool & Mfg. Co.*, 316 NLRB 716 (1995) ................................27, 32, 35

*Diamond State Poultry Co.*, 107 NLRB 3 (1954) ...................................36

*FJC Sec. Servs., Inc.*,
  2-UD-366, 2008 WL 4377557 (Sept. 23, 2008)..................................30

*G4s Regulated Sec. Sols.*, 362 NLRB No. 134 (June 25, 2015)............................22

*Great Atlantic & Pacific Tea Co.*, 177 NLRB 942 (1969)......................36

*Harborside Healthcare, Inc.*,
  343 NLRB 906 (2004) ..............................................................passim

*Herbert Halperin Distrib. Corp.*,
  826 F.2d 287, 291 (4th Cir. 1987) ...............................................36

*In Re Oakwood Healthcare, Inc.*, 348 NLRB 686 (2006)......................20

*Jack Holland & Son, Inc.*, 237 NLRB 263 (1978) .................................24

*Mashantucket Pequot Gaming Enter.*, 356 NLRB No. 111 (Mar. 17, 2011) ........................................................................................34

*Millard Refrigerated*, 345 NLRB 1143 (2005)............................................28, 29, 31

*Millsboro Nursing*, 327 NLRB 879 (1999) ........................................................27

*PPG Indus., Inc.*, 350 NLRB 225 (2007) ........................................................30, 31

*Robert Orr-Sysco Food Services*, 338 NLRB 614 (2002)................................26

*Schoolman Transp. Sys., Inc.*, 319 NLRB 701 (1995) ..................................21

*Sewell Mfg. Co.*, 138 NLRB 66 (1962)..............................................................34

*SNE Enterprises, Inc.*, 348 NLRB 1041 (2006) ........................................26, 28, 30

*Taylor Wharton Division*, 336 NLRB 157 (2001)..............................................33

*Terry Mach. Co.*, 356 NLRB No. 120 (Mar. 28, 2011)..........................................34

*Westwood Horizons Hotel*, 270 NLRB 802 (1984)..................................................36

**Statutes**

29 U.S.C. § 152(2) ........................................................................................16

29 U.S.C. § 152(11) ....................................................................................18, 19

29 U.S.C. § 158(a)(1)......................................................................................3

29 U.S.C. § 158(a)(5)....................................................................................3, 16

29 U.S.C. § 160................................................................................................3

29 U.S.C. § 160(e) ........................................................................................17

29 U.S.C. § 160(f)......................................................................................3, 16, 17

C.F.R. Part 101 ..................................................................................37

C.F.R. Part 102 ..................................................................................37

C.F.R. Part 103 ..................................................................................37

NLRA § 2(2) ......................................................................................16

NLRA § 2(6) ........................................................................................6

NLRA § 2(7) ........................................................................................6

NLRA § 2(11) ..........................................................................4, 15, 18

NLRA § 8(a)(1) ....................................................................2, 3, 6, 16

NLRA § 8(a)(5) ....................................................................2, 3, 6, 16

NLRA § 8(c) ......................................................................................38

NLRA § 10(f) .....................................................................................16

## Other Authorities

79 Fed.Reg. 74308 (Dec. 15, 2014) ...................................................37

79 Fed. Reg. 74308 (April 14, 2015) ...........................................37, 38

New Rule § 102.69(a) ........................................................................38

# JURISDICTIONAL STATEMENT

This case arises out of a representation proceeding (15-RC-150090) conducted by the Regional Director ("Director") of the National Labor Relations Board ("Board" or "NLRB"), Region 32, to determine whether certain employees employed by Durham School Services ("Durham") at its Hayward, California facility wished to be represented for purposes of collective bargaining by Teamsters Local 853, International Brotherhood of Teamsters, Change to Win ("Union"). An election was held on Friday, May 8, 2015, and a slim majority of the valid votes cast favored Union representation. (Joint Appendix ("JA") 18).

Thereafter, Durham timely filed Objections to Conduct Affecting the Results of the Election, and the Union submitted a response to these objections. On June 30, 2015, after conducting a hearing, the Hearing Officer issued a Report on Objections ("Report"), recommending that Durham's objections be overruled and that the Union be certified. (JA 422, 435). Durham then timely filed its Exceptions to the Hearing Officer's Official Report on Objections. On July 29, 2015, the Regional Director issued his Decision and Certification of Representative ("Decision") overruling Durham's objections and certifying the Union as representative of the appropriate bargaining unit.

Because the Board's representation decisions are not "final orders," such decisions can be challenged only by testing the certification in a refusal to bargain

proceeding. Accordingly, Durham refused to recognize or bargain with the Union. (JA 588). On December 4, 2015, the Union filed an unfair labor practice charge (32-CA-165556) with the Board alleging an unlawful refusal to bargain. Charge p. 1. Pursuant to that charge the General Counsel issued a complaint on December 21, 2015, alleging that Durham violated Sections 8(a)(5) and (1) of the Act by failing and refusing to recognize and bargain with the Union following the Union's certification in Case No. 32-RC-150090. (JA 588). Durham filed an answer on January 4, 2016, admitting in part and denying in part the allegations of the complaint, and asserting affirmative defenses. On January 11, 2016, the General Counsel filed a Motion for Summary Judgment. On January 13, 2016, the Board issued an order transferring the proceeding to the Board and a Notice to Show Cause why the motion should not be granted. Durham filed a motion in opposition to the Motion for Summary Judgment, in which Durham admitted its refusal to bargain but contested the validity of the Union's certification based on its objections to the election in the representation proceeding. On February 19, 2016, a three-member panel of the Board, with one member dissenting in part, denied Durham's request for review of the Regional Director's Decision and Certification of Representative on the basis that it raised no substantial issues warranting review. The Board granted the General Counsel's Motion for Summary Judgment and denied Durham's motion in opposition to the Motion for Summary Judgment. (JA

588-90). The Board therefore found that Durham unlawfully failed and refused to recognize and bargain with the Union in violation of Sections 8(a)(1) and (a)(1) of the Act.

Durham, as an aggrieved party, filed its petition for review in this Court on February 26, 2016, pursuant to 29 U.S.C. § 160 and Fed. R. App. P. 15(a). The Board's Decision and Order is a "final" order, and this Court has jurisdiction pursuant to 29 U.S.C. § 160(f). The Act specifies no time period for filing a petition for review or enforcement.

## STATEMENT OF ISSUES

1.      Whether the Board's findings and conclusions that Petitioner violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5), by refusing to recognize and bargain with the International Brotherhood of Teamsters Local 853 (the "Union") are supported by substantial evidence and reasonably consistent with the law.

2.      Whether the Board properly certified the Union as the exclusive bargaining representative of certain of Petitioner's employees.

3.      Whether the Board properly denied Petitioner's request for review of the Regional Director's Decision and Certification of Representative.

## PERTINENT STATUTES

The pertinent statutes are set out in the addendum to this brief.

## STATEMENT OF THE CASE

### Procedural History

On April 14, 2015, the Union filed a petition seeking to represent a unit of full-time and part-time routers, dispatchers, payroll department employees, and office administrators employed by Durham at its Haywood, California facility. The Director approved a Stipulated Election Agreement on April 20, 2015, and a secret ballot election was conducted on May 8, 2016. Out of the seven eligible voters, four votes were cast in favor of the Union, two votes were cast against the Union, and one ballot was challenged and non-determinative. (JA 18).

On May 15, 2015, Durham timely filed Objections to the Conduct Affecting the Result of the Election. (JA 19-22). After conducting a hearing, the Hearing Officer issued a Report on June 30, 2015, recommending that Durham's four objections be overruled in their entirety. (JA 435). Durham timely filed Exceptions to the Hearing Officer's recommendations on July 14, 2015, contending that the Hearing Officer erred in ruling that: (1) Durham failed to prove that Michelle Dorton holds Section 2(11) supervisory authority over any of the eligible voters; (2) Dorton's pro-union conduct would not have reasonably coerced the free choice of the employees who she does not directly supervise; and (3) the evidence is

4

insufficient to establish that there was any suggestion during the critical period that the Employer's decision to challenge certain ballots was racially motivated. (JA 438-39). The Regional Director issued a Decision and Certification of Representative affirming the Hearing Officer's Report and finding that all four objections should be summarily overruled. (JA 500).

To test the Union's certification, Durham refused to recognize the Union. This resulted in the Union filing an unfair labor practice charge. (JA 554). On December 21, 2015, the Board's General Counsel issued a Complaint against Durham, alleging that it had unlawfully refused to recognize and bargain with the Union. (JA 489). Durham filed its Answer on January 4, 2016, admitting the Union's certification, but denying the validity of the certification. (JA 489). On January 11, 2016, the General Counsel filed a Motion to Transfer Proceedings to the National Labor Relations Board and for Summary Judgment. (JA 489). On January 13, 2016, the Board issued an order transferring the proceeding to the Board and a Notice to Show Cause why the Motion for Summary Judgment should not be granted. (JA 489). Durham filed a motion in opposition to the Motion for Summary Judgment. (JA 581-87).

On February 19, 2016, the Board issued a Decision and Order finding that Durham engaged in unfair labor practices affecting commerce within the meaning of Sections 8(a)(1) and (a)(5) and Sections 2(6) and (7) of the National Labor

Relations Act. (JA 590). Durham filed its petition for review in this Court on February 26, 2016. The Board filed a cross-application for enforcement on April 14, 2016. The Clerk of Court consolidated the proceedings on April 18, 2016.

**Durham's Hayward Operation**

Durham School Services is a school bus company with facilities across the United States. From its Hayward, California service center, Durham provides transportation to and from school for children with special needs, including some who require wheelchairs and other assistive devices. The Hayward facility provides services to school districts in Fremont, San Leandro, San Lorenzo, Newark, and Hayward, which amounts to upwards of 150 routes per day. Durham employs approximately 105 drivers, all of whom are represented by the Union. (JA 31).

In the morning, drivers pick up children at their homes and transport them to their respective schools, typically between 6:30 a.m. and 9:30 a.m. In the afternoon, drivers pick children up at school and transport them home, typically between 12:00 p.m. and 4:00 p.m. (JA 32). There are also mid-day routes that begin between 10:00 a.m. and 12:00 p.m. (JA 32).

**Lead Dispatcher Michelle Dorton**

Lead Dispatcher Michelle Dorton ("Dorton") is an open and active Union supporter. She has been in the bus industry for twenty-two years and has worked

6

at the Hayward Service Center for seventeen years.  Her badge identifies her as

"Head Dispatcher." .[1] Dorton typically works from 10:30 a.m. to 7:00 p.m. in the

dispatch office with dispatcher Adela Garcia ("Garcia") reporting to her. (JA 29,

35, 231-32).

Dispatchers are responsible for managing drivers to ensure they leave the

bus yard on time, pick up children in a timely fashion, transport children to school

safely, and ensure children are safely returned home.  Dispatchers are also

responsible for ensuring all routes are covered in the event a driver calls off.  They

must consider various factors in covering the routes. They use a computer program

called "Versatrans," route sheets, and their own personal knowledge of the drivers,

routes, and children to provide the best service possible.  If a vehicle breaks down,

dispatchers are responsible for arranging another bus for transportation and

ensuring safe transportation to school or home as quickly as possible.

**Dorton's Role as Lead Dispatcher**

As Lead Dispatcher, Dorton is required to maintain knowledge of all 150

routes and the conditions of each child to ensure drivers have the proper equipment

and vehicles to accommodate the children.  If a driver calls off, Dorton uses her

knowledge of the routes and her memory to determine the best course of action.

---

[1] General Manager Ronald Mahler confirmed that Dorton's official title is "Lead
Dispatcher". (JA 172-73, 175).

(JA 36-38). She consults a number of tools in executing her duties— including Versatrans, which contains various route details, and Durham's "fleet board," which contains specific information concerning the routes—to make decisions. (JA 36-37, 62-63).

### *Approving Time Off*

One of Dorton's primary responsibilities is to approve employee requests for time off and to make sure routes are covered when employees take time off. (Supplemental Appendix ("SA") 1-2). When she receives a time-off request slip, Dorton either signs it herself or provides it to the Operations Supervisor to sign. (JA 56, 184,

Although Dorton, who is pro-union, attempted to downplay her authority, the record establishes she in fact has authority. (JA 57-59, 184, 288, 310-27, 331-32). She routinely signed and approved time-off slips. . Dorton confirmed that she has been primarily in charge of time slips, and that a previous General Manager granted her the authority to grant time off. Indeed, Dorton still approves time-off requests. (JA 178, 185-86, 217, 310-29).

For time off requests that Dorton approves, employees avoid being assessed attendance points under Durham's attendance policy.  Dorton uses her own discretion in considering the reason for the request, the number of drivers on duty, and the type of route, to determine whether to grant time off.  She keeps a daily list

8

of employees who take off without permission, and drivers are disciplined based on this information. (JA 60-61,74-75, . Employees may submit a time-off slip to one of only three people at Durham: Dorton, the Operations Supervisor Wilson, or General Manager Ronald Mahler. (SA 3-4; JA 173, 177, 308-09).

### *Other Examples of Supervisory Authority*

Drivers are instructed to contact Dorton if a driver transports a child to his or her home and a parent or responsible party is not there. Dorton then works with the school district to determine the best course of action, and Dorton makes the decision regarding whether to send another bus to pick up the child, or have the driver bring the child back to the bus yard. She also assigns drivers to routes in the event of a conflict.

### *Supervisory Authority Over Dispatchers and other Employees*

Paula Moncado gave extensive testimony regarding Dorton's supervisory duties. (JA 98-100, 103-05, 107-11, 119-20).[2] At the beginning of her assignment in the dispatch office, Moncado was instructed that as a dispatcher, she would take orders from Dorton, and would need to obtain Dorton's approval if she needed to leave work early or receive instructions. (JA 108, 110). Dorton assigned Moncado

---

[2] The Hearing Officer stated: "Moncado impressed me as a credible witness because she came across as open and forthright in her testimony, she had a good recollection of the events she was questioned about, and the record establishes that she was not prepped by the Employer's counsel prior to her testimony." (JA 428).

work, which included asking Moncado to contact parents, answer phones, call out information on the radio, obtain documents from a printer out of the office, and other various assignments.

Moncado testified that Dorton supervised her and other employees in the dispatch office (JA 109-10, 119-20), and that she would never refuse one of Dorton's orders. (JA 116). For example, one busy day in the dispatch office, Moncado was speaking with an employee named Sharon. Dorton approached them and said, "Excuse me, are you two still on the clock?" They confirmed that they were, to which Dorton replied, "Then I expect you should be working." The employees returned to work. Another employee, Maria Lopez, also observed that conversation.

Dorton also counsels employees in dispatch on their job performance. This includes instructing them on proper phone technique and proper communication with drivers. . Dorton is also authorized to give verbal counseling to drivers and question employees when mistakes are made. .

One instance of Dorton's verbal discipline of Moncado stood out. Moncado filed a grievance with the Union claiming that Dorton, the "head dispatcher," "belittled" and "embarrassed" her. (JA 113, 119, 371-72). An incident report was prepared on the issue and a Union meeting was planned to discuss Dorton's supervisory conduct. (JA 113, 180-81, 371-72).

10

**Dorton's Union Activities**

Dorton communicated directly with Union Organizer Rodney Smith ("Smith") in the months leading up to the May 8, 2015 election. (JA 302-07). Dorton obtained information from the Union and communicated to eligible voters regarding when and where Union meetings would take place, and she would communicate other details regarding the campaign. (JA 222-23, 260).

### First Meeting

In April 2015, Dorton and eligible voters attended a meeting with the Union at TOGO's, a restaurant in Hayward, California. (JA 224). Durham employees Shirley Myers (administrator) and Candace Comandao (router) learned of the Union meeting from Dorton, and Dorton told them both that they needed to attend. (JA 222, 260). Myers, Comandao, Garcia, router Sherry Head, and payroll administrator Darlene Corley all attended. (JA 237).

During this meeting, and at other times, Dorton assisted the Union by soliciting employees to sign and return Union authorization cards. (JA 43-45, 238). After she distributed the authorization cards to eligible employees, the employees brought them directly to her.  At one point, while cards were being passed around to sign, Dorton shouted to the group, "If you want your job, you better sign this card."  As one employee testified, this comment was meant as a threat to the entire group of eligible employees. ).

11

### *Second Meeting*

On May 7, 2015, the night before the election, several eligible employees were informed by the Union that the Employer had challenged the voting eligibility of Dorton and Corley. (JA 145-48, 256). During a telephone conference call with Union organizer Smith, an allegation was raised that Dorton and Corley had been challenged because of their race (African American). (JA 146-49). Smith concedes that during the conversation, one of the individuals or perhaps even Union Business Agent Bender may have "raised the issue of possible racism by the Employer in connection with the individuals they had identified to challenge." . Attempting to distance himself from the comment, Smith testified that "I just know I didn't say it," and explained that he would have "just brush[ed] it off," rather than address the comment. .

That same night, Comandao learned about the challenged ballots during a speakerphone telephone call with Dorton and Head. (JA 256-58). Comandao testified that all three of them were "upset" by the fact that Durham would not "allow" individuals to vote. (JA 256-59). Based on this interaction, Comandao, who prior to May 7, 2015, had decided to vote "no," became very upset, and changed her vote to "yes." Comandao even told another employee on May 8, 2015 that the Employer's decision to challenge the votes was "a race thing," and that she had changed her mind as to how she would vote. (JA 234-35).

12

## Objections

### A.    Objection 1

Durham's first objection made the following allegations:

> The requisite laboratory conditions for a fair election
> were not present for the May 8, 2015 election referenced
> above inasmuch as the pro-union coercive conduct of a
> supervisor reasonably tended to interfere with the eligible
> voters' freedom of choice in the election and materially
> affected the outcome of the election. Such conduct
> tainted the election process.

### B.    Objection 2

Durham's second objection made the following allegations:

> The pro-union coercive conduct of a supervisor
> reasonably tended to interfere with the employees'
> freedom of choice whether to sign or not sign a union
> authorization card. Such conduct tainted the election
> process.

### C.    Objection 3

Durham's third objection alleges:

> The Union, through its agents and representatives,
> coerced and threatened employees with being associated
> with unlawful activity by the exercise of a possible ballot
> challenge by the Employer, even though the exercise of
> such right is both lawful and protected. The objectionable
> conduct included the interference with the election by,
> among other things, creating the intimidation of voters
> that casting a ballot against the Union was supportive of
> unlawful acts and to avoid being associated with
> unlawful acts the employees needed to only vote for the
> Union. These improper and interfering actions restrained
> employees in the exercise of their rights and took place in

13

spite of the right by either party to challenge ballots as
part of the NLRB election process.

**D.    Objection 4**

Durham's fourth objection alleges:

> The Union, through its agents and representatives,
> coerced and intimidated employees into voting yes by
> advising employees that the Employer's lawful challenge
> was going to prevent pro-union employees from having
> the opportunity to exercise their right to vote.

## SUMMARY OF ARGUMENT

In the weeks and days before the May 8, 2015 election, which was decided
by a one-vote margin, Michelle Dorton, a Durham supervisor, actively solicited
employees to sign authorization cards and engaged in other pro-union behavior that
reasonably tended to interfere with the free choice of the voters within the unit.

Michelle Dorton is a Section 2(11) supervisor, meaning her conduct leading
up to the election is analyzed with heightened scrutiny. Dorton is the only "Lead
Dispatcher" at the Hayward facility. Employees go to her to obtain approval of
time-off requests. She is also authorized to issue verbal counseling to employees,
assign drivers to routes, and assign tasks to dispatchers. Dorton is viewed as a
supervisor within the facility.

Dorton's pro-union conduct would have reasonably coerced the free choice
of employees in the bargaining unit because of her active campaigning and card
solicitation, and because during a Union meeting, she threatened nearly the entire

14

bargaining unit by saying they would lose their jobs if they did not sign the cards. This supervisory taint is not tolerated by the Board, and it is grounds to set aside an election.

Finally, on the night before the election, during a call with the Union, information was disseminated to employees that Durham's decision to challenge two ballots was racially motivated. Thus, agents or representatives of the Union led employees to believe that the employer's challenge of ballots was racially motivated, thereby interfering with free choice.

Thus, the NLRB's findings in this case are not supported by substantial evidence on the record as a whole.[3]

## STATEMENT OF STANDING

Durham is an employer within the meaning of section 2(2) of the Act, 29 U.S.C. § 152(2). The Board's General Counsel issued a complaint alleging that Durham violated Sections 8(a)(1) and (a)(5) of the Act. 29 U.S.C. § 158(a)(5). The Board subsequently issued a final order finding that Durham had unlawfully refused to recognize and bargain with the Union. The Board's Order directs that Durham cease and desist from such conduct, and recognize and bargain with the Union. Durham is an "aggrieved" party within the meaning of section 10(f) of the

---

[3] National Labor Relations Act, 29 U.S.C § 160(f).

Act, 29 U.S.C. § 160(f), and has standing under that section to seek review of the Board's final order in this Court.

## ARGUMENT

**Standard Of Review**

The Board's findings of fact are to be treated by the courts as conclusive so long as they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C § 160(e)-(f). The Supreme Court has interpreted this standard to mean that a reviewing court is entitled to set aside the Board's findings of fact only "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Courts have wider latitude in reviewing the Board's conclusions of law. A court must give the Board's decision controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute. *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324 (1994).

"The Board's discretion to assess the propriety and results of representation elections is broad." *North of Market Senior Services, Inc. v. NLRB*, 204 F.3d 1163, 1167 (D.C. Cir. 2000). Although the Board is entitled to deference, "Board orders will not survive review when the Board's decision has no reasonable basis in law," or "when the Board has failed to apply the proper legal standard" or "when it

16

departs from established precedent without reasoned justification." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445-446 (D.C. Cir. 2004). "Without more, the Board's departure from precedent without a reasoned analysis renders its decision arbitrary and capricious." *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 119, 123 (D.C. Cir. 2001). The party seeking to prove supervisory status must establish it by a preponderance of the evidence. *Alternate Concepts, Inc.*, 358 NLRB 292, 294 (2012).

**Discussion Of Issues**

**A.      Because Dorton Is A Section 2(11) Supervisor, Her Pro-Union Conduct Leading Up To The Election Is Analyzed With Heightened Scrutiny.**

As the Supreme Court has acknowledged, the Board appears to be in a constant "running struggle to limit the impact of 'responsibly to direct' on the number of employees qualifying for supervisory status." *Buchanan Marine, L.P.*, 363 NLRB No. 58, at *4 (Dec. 2, 2015) (Member Miscimarra dissenting). The Supreme Court has "continually rejected" attempts such as this to erode the distinction between "supervisor" and "employee" under the Act. *Id.* Here, the Board has yet again ignored the clear evidence of supervisory status, reaching to conclude that a clear supervisor, is in fact not a supervisor.

Section 2(11) of the Act sets forth a three-part test used to determine supervisory status. 29 U.S.C. § 152(11). Employees are statutory supervisors if they: (1) hold the authority to engage in any one of twelve enumerated supervisory

17

functions; (2) their exercise of such authority is not merely routine or clerical in nature, but requires the use of independent judgment; and (3) their authority is held in the interest of the employer. *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 712-13 (2001) (citing *NLRB v. Health Care & Retirement Corp. of America*, 511 U.S. 571, 573–574 (1994)). Thus, a "supervisor" is "any individual having authority . . . to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances." *Id.* at 719. "Any one" of these "distinct indicia" "is sufficient to make its possessor a supervisor." *Buchanan Marine, L.P.*, 363 NLRB at *4. Even if the individual "has no direct authority to take any of the 12 actions enumerated . . . he or she is still a supervisor . . . if he or she possesses the authority to 'effectively . . . recommend' any one of the 12 actions." *Id.* Dorton easily meets this standard based on the record evidence.

### 1.    Dorton Possesses General Discretionary Authority of a Supervisor.

As the Hearing Officer conceded, the record evidence establishes that Dorton: (1) is authorized to approve time-off for drivers; (2) is responsible for assigning routes when drivers are absent from work or when the route needs to be covered for any other reason; and (3) is responsible for giving verbal performance counseling to drivers and other employees. (JA 426). All of these factors are indicia of supervisory status. *See, e.g., Kentucky River*, 532 U.S. 710-20 (2001).

Dorton must also maintain a working knowledge of all 150 bus routes, the particular disabilities of each child, and when complications occur, employees go to her for resolution. (JA 36-38,. Dorton is the only individual at Durham's Hayward facility identified as "Lead" or "Head Dispatcher," and employees view her as a supervisor. (JA 33, 103, 109-10).

Also, Dorton counsels employees in dispatch on their job performance by instructing them on proper phone technique and how to properly communicate with drivers. (JA 110). In handling complaints from angry or upset parents about transportation issues, Dorton is also authorized to give verbal counseling to drivers, and she has the authority to question employees when mistakes are made. (JA 87-88). Perhaps most importantly, when problems arise, Dorton uses her independent judgment to determine the best course of action. (JA 36-38, 62-63, 67). When making these decisions, Dorton alters drivers' routes, communicates with parents and school boards, and decides where disabled and special needs children should go in the event of a delay. (JA 67, 187-89). *See In Re Oakwood Healthcare, Inc.*, 348 NLRB 686, 691 (2006) (stating that if a person has employees under her, and "if that person decides what job shall be undertaken next or who shall do it, that person is a supervisor, provided that the direction is both responsible . . . and carried out with independent judgment."). The record leaves no doubt that Dorton exercises independent judgment -- a term that applies "without regard to whether

19

the judgment is exercised using professional or technical expertise." *Id.* at 692. Nothing in the record suggests that Dorton's daily judgments are "controlled by another authority." *Id.*at 686.

Lastly, the degree of discretion Dorton uses in making judgments rises far above "routine or clerical." *Id.* Dorton is responsible for ensuring the safety and wellbeing of hundreds of special needs children in several school districts in the greater Bay Area. (JA 30-31, 36-38, 187). When faced with stressful situations such as a guardian not being home or a bus breaking down, Dorton uses her own judgment to determine the best course of action. (JA 67-69). *Compare NLRB v. Atl. Paratrans of N.Y.C., Inc.*, 300 F. App'x 54, 56-57 (2d Cir. 2008) (finding no record evidence suggesting dispatcher relied on her own experience to assess situation and determine appropriate response and no testimony regarding how dispatcher proceeds in the event of an accident or incident on a driver's route), *with Schoolman Transp. Sys., Inc.*, 319 NLRB 701, 709, 715-16 (1995) ("head dispatcher" was a supervisor because, among other things, he "arranged work schedule switches and vacation requests for dispatchers."). Notably, for purposes of determining whether an individual is a supervisor, "it does not matter that the individuals that he exercised authority over were not part of the bargaining unit." *Id.* at 716. Thus, even though Dorton exercised authority over individuals both inside and outside the bargaining unit, such a distinction is irrelevant. *See Desert*

*Hosp. v. NLRB*, 91 F.3d 187, 192-93 (D.C. Cir. 1996) (finding individual who exercised no authority over bargaining unit employees to nonetheless be a supervisor because she held a different position from other employees and she "oversaw non-unit employees, assigning them to particular cases and granting them overtime.").

### 2. Dorton's Authority Over Moncado and Garcia Cements Her Supervisory Status.

Additionally, the record leaves no question that Paula Moncado, who worked as a dispatcher in 2015, was instructed to take orders from Dorton, and was required to obtain Dorton's approval if she needed to leave work early. . Dorton provided Moncado with her work assignments, and managed her day-to-day activities. (JA 107-11).

Moncado confirmed that besides drivers, Dorton supervised employees in the dispatch office as well. (JA 109). On one occasion in the dispatch office, Moncado was speaking with an employee. Dorton approached the two employees and said, "Excuse me, are you two still on the clock?" (JA 109). When the employees confirmed that they were, Dorton replied, "Then I expect you should be working." . The employees heeded her command and went back to work. . *See G4s Regulated Sec. Sols.*, 362 NLRB No. 134, at *6 (June 25, 2015) (Member Miscimarra dissenting) (fact that employees view individual as supervisor is indicia of supervisor status); *see also Micro Pac. Dev. Inc. v. NLRB*, 178 F.3d 1325,

21

1333 (D.C. Cir. 1999) (that employees believed that the individual was in charge of them led to a finding of supervisory status).

On a separate occasion, Dorton's verbal disciplining of Moncado escalated to the point that Moncado filed a grievance with the Union. She claimed that Dorton, the "head dispatcher," "belittled" and "embarrassed" her. (JA 113, 119, . An incident report was prepared on the issue and the Union scheduled a meeting to address Dorton's supervisory conduct in relation to her employees. (JA 113, 180-81, 371-72). This again indicates Dorton's supervisory status under the law. *See Micro Pac. Dev. Inc.*, 178 F.3d at 1333 (supervisory status found where employees petitioned to replace putative supervisor "because of supervisory shortcomings," and the company's response to it "would not have occurred unless [the individual] was both treated as a supervisor by [the company] and, more importantly, viewed as such by the other employees.").

The record further demonstrates that Dorton supervises and directs dispatcher Adela Garcia. (JA 29, 35, 231-32). For instance, administrator Shirley Myers, who the Hearing Officer found to be credible,[4] testified that she witnessed Dorton making statements to Garcia such as, "did you call that parent," "did you

---

[4] The Hearing Officer stated: "I found Myers to be a reliable witness. Although Myers appeared to be nervous, there was nothing in her demeanor that suggested that she was trying to hide anything. Myers answered the questions that were posed to her openly and indicated when she did not know or could not recall the answer to a question. I therefore credit Myers' testimony." (JA 430).

route those kids," "check the binder," and "make sure those buses are in." (JA 427).[5] Despite reliable testimony from Myers that Dorton issues directions and assignments to Garcia, however, the Hearing Officer stated: "it is not clear that Dorton doesn't issue minor guidance to Garcia as a result of her experience and expertise rather than any supervisory relationship." (JA 427). Such a finding is inconsistent with the well-established Board law cited above; Dorton need only *possess* the authority to assign duties or responsibly direct employees to be considered a supervisor. *Kentucky River*, 532 U.S. at 719. And while Dorton clearly possesses supervisory authority over drivers and dispatchers alike, supervision of merely one employee is a sufficient basis finding an individual to be a statutory supervisor. *See Jack Holland & Son, Inc.*, 237 NLRB 263, 264-65 (1978).

## B.     Dorton's Pro-Union Conduct Reasonably Coerced The Free Choice Of Employees.

The Board erred and departed from established precedent in finding that Dorton's pro-union conduct did not reasonably coerce the free choice of employees. In *Harborside Healthcare, Inc.*, the Board broadened its protections against pro-union supervisor conduct. 343 NLRB 906 (2004). The Board emphasized that

---

[5] While Dorton "generally denied having any supervisory authority over Garcia, or any other employees," she was found not to be credible, as she lied to the Hearing Officer on several occasions. (JA 427).

because supervisors have the power to affect the day-to-day working life of employees, supervisory solicitation of union authorization cards is "inherently coercive absent mitigating circumstances." *Id.* "[E]mployees solicited by a supervisor would reasonably be concerned that the right response will be viewed with favor, and a wrong response with disfavor." *Id.* For this reason, the Board no longer requires an "explicit threat of reprisal or promise of benefit" to set aside an election due to pro-union supervisor conduct. *Id.*; *NLRB. v. Family Fare, Inc.*, 205 F. App'x 403, 408 (6th Cir. 2006) ("the *Harborside* inquiry seeks to foreclose conduct -- however implicit or subtly framed -- that, in the aggregate, pressures employees to support or oppose unions out of fear of retaliation or hope for preferential treatment by the supervisor."). Instead, the Board now considers two factors when deciding whether supervisory pro-union conduct upsets the required laboratory conditions for a fair election: (1) whether the supervisor's conduct reasonably tended to coerce or interfere with the employees' exercise of free choice in the election, based on (a) consideration of the nature and degree of supervisory authority possessed by those who engage in the pro-union conduct; and (b) an examination of the nature, extent, and context of the conduct in question; and (2) whether the conduct interfered with freedom of choice to the extent that it materially affected the outcome of the election, based on factors such as (a) the margin of victory in the election; (b) whether the conduct at issue was

widespread or isolated; (c) the timing of the conduct; (d) the extent to which the conduct became known; and (e) the lingering effect of the conduct. *Harborside*, 343 NLRB at 909.

Dorton, who had authority to affect schedules, grant or deny time-off requests, and assign tasks to employees, was the most active and open Union supporter at the facility. . She is the reason several of the employees attended Union meetings. (JA 222, 260). Thus, the record indisputably shows that Dorton's conduct *did* affect the outcome of the election. (JA 256-57).

### 1.     Dorton's Conduct Interfered With Employees' Exercise of Free Choice.

Dorton's conduct easily meets the first *Harborside* prong—that it reasonably tended to coerce or interfere with the employees' exercise of free choice—because she actively solicited employees to attend meetings and to sign Union authorization cards from everyone in the bargaining unit. (JA 43-45). Thus, due to the Board's "obligation to carefully scrutinize objections in close elections," any mitigating circumstances would have to be substantial to weigh against setting aside the election. *SNE Enterprises, Inc.*, 348 NLRB 1041, 1044 (2006) (citing *Robert Orr-Sysco Food Services*, 338 NLRB 614, 615 (2002)).

It would belie logic to find that Dorton's pro-union conduct was not coercive under these standards. At the first meeting with potential bargaining unit employees, which Dorton aggressively advertised to potential bargaining unit

25

members and which was attended by nearly the entire bargaining unit, (JA 224,

237), Dorton shouted while cards were passed around: "If you want your job, you

better sign this card." . The Union failed to provide any "mitigating disavowal of

the threat." *Robert Orr-Sysco Food Servs., LLC*, 338 NLRB at 614 n.5 (2002).

        This explicit threat is precisely the type of conduct proscribed by

*Harborside* . Yet the Hearing Officer and Regional Director inexplicably

overlooked this threat, reasoning that Dorton "is a low-level supervisor, at best,"

and that she "has no power to carry out the threat of job loss." (JA 432). *Cf.*

*Cambridge Tool & Mfg. Co.*, 316 NLRB 716 n.4 (1995) ("the fact that a threat

does not produce the desired result does not mean it was not a threat."). In arriving

at this conclusion, however, they drifted into pre-*Harborside* analysis, *i.e.* that

supervisor solicitation is not objectionable unless it contains the "seeds of potential

reprisal, punishment or intimidation." *Millsboro Nursing*, 327 NLRB 879, 880

(1999). Such explicit behavior is no longer required after *Harborside*. Instead, a

supervisor that has power to affect the "working life" of employees, whether she is

a "low-level supervisor" or not, may not engage in pro-union solicitation.

*Harborside*, 343 NLRB at 906-07, 910-12; *SSC Mystic Operating Co., LLC v.*

*NLRB*, 801 F.3d 302, 309 (D.C. Cir. 2015) ("the law always forbids a supervisor

from trying to influence the free choice of employees in exercising their Section 7

rights, regardless of what outcome the supervisor is seeking to achieve."). Dorton's

ability to change work shifts, approve time-off requests, and reprimand and counsel employees has such an effect.

While the Regional Director found that administrator Myers "may have found Dorton's statement threatening," he concluded that a reasonable employee would "interpret Dorton's comment as an expression of her own view that unionization would lead to job security rather than a threat to retaliate against employees." (JA 492). The record does not support such a tenuous interpretation. Regardless, that interpretation contradicts both the statute and Board law. *See SNE Enterprises, Inc.*, 348 NLRB at 1044 (even a friendly encounter does not "negate the coercion inherent in supervisory card solicitation."); *Avante at Boca Raton, Inc.*, 323 NLRB 555, 560 (1997) (the "focus is on the reasonableness of the employee's fears as reflected by objective facts"). Nothing in the record militates against the explicit threat Dorton made in support of the Union. Indeed, at least one employee took Dorton's statement as a direct threat. (JA 241, 251). The Board erred in failing to credit this testimony.

Indeed, the Board addressed a nearly identical situation in *Millard Refrigerated*, 345 NLRB 1143, 1144 (2005). There, the Board held that a supervisor's comments warranted setting aside a union election. 345 NLRB 1143, 1144 (2005). The objectionable comments included: "If the union does not get in, everybody will probably be fired," and "Either vote for the union or I'll make your

life a living hell." *Id.* Notably, the Board set aside the election because the comments were "not ambiguous," and because "the effects of this coercion may continue to be felt during the critical period between the filing of the petition and the election, even if the card solicitation occurred prior to the filing of the petition." *Id.* at 1144-45.

Here, Dorton's statement is indistinguishable from those in *Millard Refrigerated*. Even accepting the Board's unsupported position that Dorton was merely expressing her own preference for the Union, its conclusion cannot be reconciled with that case. If not construed as a direct threat, the implication from the Board's reading of the warning "If you want your job, you better sign this card" is that employees will be fired if the Union election campaign fails. This expresses the sentiment that "everybody will probably be fired." *Id.* at 1146. This removes any doubt that Dorton's conduct reasonably tended to interfere with the employees' exercise of free choice in the election.

### 2. Dorton's Interference With Freedom of Choice Materially Affected the Outcome of the Election.

Even the Hearing Officer recognized that the second *Harborside* prong "would weigh in favor of setting the election aside in this case if the first prong of Harborside were satisfied." (JA 433). She noted that, "given the small size of the unit and the narrow margin of the election, wherein a single vote could have changed the outcome . . . any coercive conduct could have materially affected the

outcome of the election." (JA 433). Indeed, each of the factors identified in

*Harborside* weighs in favor of finding that Dorton's interference materially

affected the free choice of bargaining unit employees or is at best neutral.

*Harborside*, 343 NLRB at 909.

First, the margin of victory in the election clearly weighs in Durham's favor.

The Union won the election by a vote of 4 to 2. (JA 18). A single vote cast for the

Union because of Dorton's threat would swing the election. *See NLRB v. Claxton*

*Mfg. Co.*, 613 F.2d 1364, 1366 (5th Cir. 1980) (the Court "must consider the

possibility that the objectionable conduct itself contributed to the margin of

victory."). Her interference with employees' free choice could not have a more

meaningful impact on the election. *See, e.g.*, *SNE Enterprises*, 348 NLRB at 1041

n.2 (objectionable conduct materially affected election where union prevailed by

five votes); *cf. FJC Sec. Servs., Inc.*, 2-UD-366, 2008 WL 4377557 (Sept. 23,

2008) (citing *Avis-Rent-A-Car System*, 280 NLRB 580, 581-82 (1986) ("The

burden of proof is particularly heavy where the margin of victory is significant.").

Second, while Dorton's explicit threat occurred in one incident at a meeting

with bargaining unit employees, she continued soliciting on behalf of the union .

Moreover, the threat itself was significant. Due to the small size of the bargaining

unit, nearly the entire unit was present for Dorton's threats.[6] At best, this factor is

---

[6] Dorton, Myers, Comandao, Garcia, Head, and Corley all attended. .

neutral for the Union. *PPG Indus., Inc.*, 350 NLRB 225, 226 (2007) (widespread dissemination of threats to bargaining unit warrants setting aside election).

Third, the timing of Dorton's threat is significant. While the exact date of the meeting is in dispute, it occurred sometime in April 2015, just before the May 8 election. . Therefore, it occurred in or around the critical period for representation elections. *Millard Refrigerated Servs., Inc.*, 345 NLRB 1143, 1144 (2005). Moreover, Dorton did nothing to mitigate her pro-Union conduct. *See Veritas Health Services, Inc. v. NLRB*, 671 F.3d 1267, 1273 (D.C. Cir. 2012) (finding conduct objectionable and coercive, but relying on supervisors' subsequent campaigning against the union as a mitigating circumstance). Nor did Durham have time to mitigate her disavowal. *Harborside*, 343 NLRB at 914 ("Conceivably, if higher management learns of the supervisory conduct, and takes timely and effective steps to disavow it as to all of the employees, the supervisor's conduct may be mitigated."). As in *Harborside*, "there is no evidence of such mitigation here." *Id.*

Fourth, the extent to which Dorton's conduct became known further indicates that it materially affected the election. As noted, nearly all members of the small bargaining unit were present at the meeting at which Dorton issued her threat. . The conduct was thus immediately made known to almost the entire bargaining unit. *See PPG Indus.*, 350 NLRB at 226.

30

Finally, Dorton's threats would certainly have a "lingering effect" on the employees. *Harborside*, 343 NLRB at 913 ("[t]hreats of job loss are highly coercive and one of the most serious forms of election misconduct."). Indeed, as this Court has stated, "the average employee is more concerned about the attitude of his immediate supervisor[s] than he is with the feelings of the company president," as his immediate supervisors "control his day to day life." *SSC Mystic Operating Co., LLC*, 801 F.3d at 309 (quoting *Turner's Express, Inc. v. NLRB*, 456 F.2d 289, 292–93 (4th Cir. 1972). Because each of these factors weighs in Durham's favor, or is neutral, the Board erred in concluding that Dorton's conduct did not materially affect the outcome of the election.

**C.    Appeals to Racial-Bias Affected the Outcome of the Election.**

> **1.    The Conduct of Union Business Agents Improperly Affected the Outcome of the Election.**

During the critical period, information was disseminated to employees during a conversation with the Union suggesting that Durham's decision to challenge two ballots was racially motivated, thus interfering with employees' free choice. . The proper test for evaluating the conduct of a party in a representation election is an objective one; that is, whether it has "the tendency to interfere with the employees' freedom of choice." *Cambridge Tool & Mfg.*, 316 NLRB 716 (1995). In making this determination, the Board considers: (1) the number of incidents; (2) the severity of the incidents and whether they were likely to cause

31

fear among the employees in the bargaining unit; (3) the number of employees in

the bargaining unit subjected to the misconduct; (4) the proximity of the

misconduct to the election; (5) the degree to which the misconduct persists in the

minds of the bargaining unit employees; (6) the extent of dissemination of the

misconduct among the bargaining unit employees; (7) the effect, if any, of

misconduct by the opposing party to cancel out the effects of the original

misconduct; (8) the closeness of the final vote; and (9) the degree to which the

misconduct can be attributed to the party. *See Taylor Wharton Division*, 336

NLRB 157 (2001); *Avis Rent-a-Car System*, 280 NLRB 580, 581 (1986).

On May 7, 2015, the evening before the election, several eligible voters took

part in a conference call with Union Business Agents Smith and Bender. (JA 145-

49, 256). Smith conceded at hearing that one of the individuals or perhaps even

Union Business Agent Bender may have "raised the issue of possible racism by the

Employer in connection with the individuals they had identified to challenge." In

fact, someone indicated that Dorton and Corely were being challenged because of

their race. . Smith, attempting to distance himself from the comment, testified: "I

just know I didn't say it," and that he would have "just brush[ed] it off." .

Thus, the night before the election, a Union official participated in a

conversation where Durham was accused of racism in connection with the

impending election, and the Union failed to disavow such conduct. *Cf. Terry Mach.*

32

*Co.*, 356 NLRB No. 120, at *4 (Mar. 28, 2011) ("[I]f higher management learns of the supervisory conduct and takes timely and effective steps to disavow it as to all of the employees, the effects of the conduct may be mitigated."). Even if the Union Business Agents did not make the racially charged suggestion themselves—which has not been established[7]—they let it go unchallenged and merely "brush[ed] it off." .

The Board has long held that irrelevant and inflammatory appeals to racial prejudice "have no place in Board electoral campaigns." *Sewell Mfg. Co.*, 138 NLRB 66, 71 (1962). Such comments:

> inject an element which is destructive of the very purpose of an election. They create conditions which make impossible a sober, informed exercise of the franchise. The Board does not intend to tolerate . . . appeals or arguments which can have no purpose except to inflame the racial feelings of voters in the election.

*Id.*; *see also Mashantucket Pequot Gaming Enter.*, 356 NLRB No. 111 (Mar. 17, 2011) (citing *Sewell Mfg. Co.*, 138 NLRB 66, 72 (the Board will set an election aside when a party "deliberately seek[s] to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals. *Sewell* places the burden on the party making use of a racial message to establish that it was truthful and germane.") (internal quotations omitted).

---

[7] The Hearing Officer discredited the testimony of business agent Bender. (JA 434).

Not only would these comments have a clear objective tendency to interfere with the employees' freedom of choice, *Cambridge Tool & Mfg.*, 316 NLRB 716 (1995), but one unit employee expressly stated that the comments at issue interfered with her free choice. Comandao testified that prior to May 7, 2015, she had decided to vote "no," but after this conversation, she became very upset and changed her vote to "yes." . Comandao even told another employee Durham's decision to challenge the votes was "a race thing," and that she had changed her mind as to how she would vote. . Because of the narrow margin of the election, this represented the decisive Union vote.

Considering the severity of the subject matter, the dissemination among the bargaining unit, the proximity of the misconduct to the election, the margin of the final vote, and the *demonstrated* effect of the comments on the outcome of the vote, the election should be set aside.

### 2.    The Conduct of a Third-Party Improperly Affected the Outcome of the Election.

Even if the suggestion that Durham planned to challenge votes based on race is not attributed to the Union or its agents, under the Board's recognized third-party misconduct standard the election should still be overturned. In general an election should be set aside for non-agent third-party conduct if "the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render

34

impossible a rational uncoerced expression of choice as to bargaining representation." *Diamond State Poultry Co.*, 107 NLRB 3, 6 (1954); *Herbert Halperin Distrib. Corp.*, 826 F.2d 287, 291 (4th Cir. 1987). *See also Great Atlantic & Pacific Tea Co.*, 177 NLRB 942, 942-43 (1969) ("For conduct to warrant setting aside an election, not only must that conduct be coercive, but it must be so related to the election as to have had a probable effect on the employees' action at the polls."). Where conduct by employees creates such conditions, the Hearing Officer is justified in setting the election aside. *See Al Long, Inc.*, 173 NLRB 447, 448 (1969) ("It is not material that fear and disorder may have been created by individual employees or nonemployees and that their conduct cannot probatively be attributed either to the [e]mployer or to the [u]nion. The *significant fact is that such conditions existed* and that a free election was thereby rendered impossible.") (emphasis added); *Westwood Horizons Hotel*, 270 NLRB 802 (1984).

Again, the comments at issue had a demonstrated effect on the election. The Court need not resort to speculation as to whether the comments on the telephone conference the night *immediately preceding* the election "had a probable effect on the employees' action at the polls." *Great Atlantic & Pacific Tea Co.*, 177 NLRB at 942-43. The record clearly establishes that Comandao changed her vote based on the suggestion that Durham intended to challenge votes based on race. (JA 234-35, 256-57). This is sufficient to cast aside the election.

35

**D.    The Imposition of the New NLRB Rules and Regulations Violate Durham's Rights and Prejudiced Durham**

The Board further erred in finding that the new NLRB Rules and Regulations do not violate the Employer's procedural due process rights and do not prejudice Durham. The imposition and implementation of the Board's new Rules and Regulations violated Durham's procedural due process rights and prejudiced Durham in these proceedings. Durham objects to the application of the new NLRB Rules and Regulations, specifically entitled "Representation Case Procedures; Final Rule," C.F.R. Parts 101, 102, 103, 79 Fed. Reg. 74308, 74, 439, effective April 14, 2015 ("New Rule") in these proceedings. The Board thus erred in denying Durham's request for review of the Regional Director's decision.

The imposition of the New Rule in these proceedings violated Durham's due process rights because the passage and imposition in representation proceedings was arbitrary and capricious under the Administrative Procedure Act. Representation—Case Procedures, National Labor Relations Board, 79 Fed.Reg. 74308, at 74430-74460 (Dec. 15, 2014) (dissenting views of Members Miscimarra and Johnson). Imposition of the New Rule also unlawfully compelled Durham to violate the personal privacy rights of its employees by forcing the disclosure of employees' personal email addresses and phone numbers. *Id.* The New Rule also unconstitutionally compelled the Durham to speech. It further compelled an election timeframe that interfered with the Durham's rights under Section 8(c) of

36

the NLRA, as Durham did not have adequate opportunity to exercise its right to free speech in the compressed timeframe imposed by the New Rule. *Id.* This ultimately resulted in frustration of the bargaining unit employees' Section 7 rights, as the lack of a full and fair debate on the relative merits of unionization frustrated their right to refrain under the Act. *Id.*

Moreover, Durham objects to the implementation of Sec. 102.69(a) of the New Rule, which required Durham's objections to be filed with the Regional Director with a written offer of proof within seven days after the tally of ballots has been prepared. Under prior rules, parties had fourteen days from the preparation of the tally of ballots to submit an offer of proof in support of objections. The reduction in time for Durham to file its Objections and offer of proof prevented it from having the requisite time to properly prepare its Objections to be presented in front of the Hearing Officer. Such a reduction of time for Durham to obtain and present its evidence to support its Objections prejudiced Durham.

The Board argues that the fact Durham did not request an extension to submit its offer of proof and the fact that Durham presented evidence from eleven witnesses during the hearing is evidence Durham was not prejudiced by the reduced timeframe. However, the Board fails to acknowledge that such reduction of the timeframe prevented Durham from having the requisite time to conduct a

37

full investigation into objectionable conduct prior to filing objections, the offer of proof, and presenting evidence at hearing.

Durham submits that the imposition of the New Rules in this matter materially affected the outcome of the election. Thus, the Board's decision and certification of the election should be reversed.

## CONCLUSION

Durham respectfully requests that this Court grant its petition for review and set aside the election.

Respectfully submitted,

/s/ *Amanda A. Sonneborn*
Amanda A. Sonneborn

Amanda A. Sonneborn
Brian M. Stolzenbach
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois, 60603
Tel: (312) 460-5000
Fax: (312) 560-7000

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains 8,771 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[        ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2007* in *14pt Times New Roman*; or

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: September 30, 2016                    /s/ Amanda A. Sonneborn
                                            Counsel for the Petitioner

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 30th day of September, 2016, I caused this Brief

of Petitioner and Joint Appendix to be filed electronically with the Clerk of the

Court using the CM/ECF System, which will send notice of such filing to the

following registered CM/ECF users:

> Linda Dreeben
> Usha Dheenan
> Email: usha.dheenan@nlrb.gov
> Milakshmi Varuni Rajapakse
> Email: milakshmi.rajapakse@nlrb.gov
> National Labor Relations Board
> (NLRB) Appellate and Supreme Court Litigation Branch
> 1015 Half Street, SE
> Suite 8100
> Washington, DC 2057

> *Counsel for Respondent*

I further certify that I caused the required number of copies of this Brief of

Petitioner and Joint Appendix to be filed with the Clerk and served on the

following via Federal Express:

> Cynthia Rence
> Acting Regional Director
> National Labor Relations Board Region 32
> 1301 Clay Street, Suite 300N
> Oakland, CA 94612-5224

> Valerie Hardy-Mahoney
> Counsel for the General Counsel
> National Labor Relations Board
> Region 32
> Oakland Federal Building
> 1301 Clay Street, Suite 300N

Oakland, CA 94612

Delisai Nisperos
Beeson, Tayer & Bodine
485 Ninth Street, 2nd Floor
Oakland, CA 94607

/s/ Amanda A. Sonneborn
*Counsel for the Petitioner*

# **ADDENDUM**

# TABLE OF CONTENTS

**Page**

Sec. 2(2) [29 U.S.C. § 152(2)] ...........................................................................Add. 1

Sec. 2(11) [29 U.S.C. § 152(11)] ......................................................................Add. 1

Sec. 8(a)(1) [29 U.S.C. § 158(a)(1)] .................................................................Add. 1

Sec. 8(a)(1) [29 U.S.C. § 158(a)(1)] .................................................................Add. 1

Sec. 10(f) [29 U.S.C. § 160(e)] .........................................................................Add. 1

Sec. 10(f) [29 U.S.C. § 160(f)] .........................................................................Add. 2

# ADDENDUM

The relevant statutes and regulations are set out below:

## National Labor Relations Act

### Sec. 2(2) [29 U.S.C. § 152(2)]

The term "employer" includes any person acting as an agent of an employer, directly or indirectly, but shall not include the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof, or any person subject to the Railway Labor Act [45 U.S.C. 151 et seq.], as amended from time to time, or any labor organization (other than when acting as an employer), or anyone acting in the capacity of officer or agent of such labor organization.

### Sec. 2(11) [29 U.S.C. § 152(11)]

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

### Sec. 8(a)(1) [29 U.S.C. § 158(a)(1)]

It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

### Sec. 8(a)(1) [29 U.S.C. § 158(a)(1)]

It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

### Sec. 10(f) [29 U.S.C. § 160(e)]

The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district,

respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to grant such temporary relief or restraining order as it deems just and proper, and to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the record. The Board may modify its findings as to the facts, or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings, which findings with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive, and shall file its recommendations, if any, for the modification or setting aside of its original order. Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review by the appropriate United States court of appeals if application was made to the district court as hereinabove provided, and by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

## Sec. 10(f) [29 U.S.C. § 160(f)]

Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. A copy of such petition shall be forthwith transmitted by the

clerk of the court to the Board, and thereupon the aggrieved party shall file in the court the record in the proceeding, certified by the Board, as provided in section 2112 of title 28. Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e), and shall have the same jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.